IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>     v.<br><br>STATE OF TEXAS; JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br><br>            Defendants. | Civil Action No. |

## COMPLAINT

The United States of America, plaintiff herein, alleges:

1. The Attorney General files this action pursuant to Sections 2 and 12(d) of the Voting Rights Act, 42 U.S.C. §§ 1973 & 1973j(d), to enforce the voting rights guaranteed by the Fourteenth and Fifteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

2. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201 and 42 U.S.C. § 1973j(f).

3. Venue is proper in this court under 28 U.S.C. §§ 124(b)(6) and 1391(b).

## PARTIES

4. The Voting Rights Act authorizes the Attorney General to file a civil action on behalf of the United States of America seeking injunctive, preventive, and permanent relief from a violation of the requirements of Section 2 of the Act.  42 U.S.C. § 1973j(d).

5. Defendant Texas is one of the states of the United States of America.

6. Defendant John Steen is the Texas Secretary of State and is sued in his official capacity. The Texas Secretary of State is the State's chief election officer. The Office of the Texas Secretary of State is responsible for coordinating the implementation of Texas Senate Bill 14 (2011) (SB 14).

7. Defendant Steve McCraw is the Director of the Texas Department of Public Safety (DPS) and is sued in his official capacity. DPS is the state agency responsible for issuing certain forms of photographic identification that Texans may present in order to cast an in-person vote under SB 14.

## ALLEGATIONS

### The State of Texas

8. According to the 2010 Census, Texas had a total population of 25,145,561, with a Hispanic population of 9,460,921 (37.6%) and a non-Hispanic black population of 2,975,739 (11.8%).

9. According to the 2010 Census, Texas had a voting-age population (VAP) of 18,279,737, with a Hispanic VAP of 6,143,144 (33.6%) and a non-Hispanic black VAP of 2,102,474 (11.5%).

10. The 2007-2011 five-year aggregate American Community Survey (ACS) estimated that the citizen voting age population (CVAP) of Texas is 15,583,700, with a Hispanic CVAP of 4,048,210 (26.0%) and a non-Hispanic black CVAP of 1,988,805 (12.8%).

11. As of April 30, 2012, 22.5% of registered voters in Texas had Spanish surnames.

12.     Based on comparisons of the 2000 Census and the 2010 Census, Hispanics comprised 65% of total population growth in the State of Texas between 2000 and 2010, and non-Hispanic blacks comprised an additional 13.4% of total population growth.

13.     The 2007-2011 ACS estimated that non-Hispanic blacks and Hispanics in Texas experience poverty at roughly three times the rates of non-Hispanic whites and that non-Hispanic white median per capita income is approximately double both Hispanic and non-Hispanic black median per capita income.

14.     The 2009-2011 ACS estimated that only 3.8% of non-Hispanic white-led households in Texas lack access to a vehicle, whereas 7.2% of Hispanic-led households and 12.9% of non-Hispanic black-led households lack access to a vehicle.

15.     The State of Texas's history of official racial discrimination against its African-American and Hispanic citizens is longstanding and well-documented.  *See LULAC v. Perry*, 548 U.S. 399, 439-40 (2006); *Bush v. Vera*, 517 U.S. 952, 981-82 (1996) (plurality opinion); *White v. Regester*, 412 U.S. 755, 767-70 (1973).  Federal intervention has been necessary to eliminate numerous devices intentionally used to restrict minority voting in Texas.  *See, e.g.*, *White*, 412 U.S. at 768 (poll tax); *Terry v. Adams*, 345 U.S. 461 (1953) (private primary); *Smith v. Allwright*, 321 U.S. 649 (1944) (white primary); *Nixon v. Herndon*, 273 U.S. 536 (1927) (exclusion of minorities).

**Requirements of SB 14**

16.     SB 14 requires nearly all in-person voters in Texas to present one of the following forms of government-issued photo identification in order to vote:  (1) a driver's license, personal ID card, or election identification certificate (EIC), all of which are issued by DPS; (2) a license to carry a concealed handgun, which is also issued by DPS; (3) a U.S. military ID card; (4) a

U.S. citizenship certificate with photograph; or (5) a U.S. passport. SB 14, § 14 (codified at Tex. Elec. Code § 63.0101).

17. SB 14 prohibits the use of photo IDs for election identification purposes that have expired more than "60 days before the date of presentation" at the polls. SB 14, § 14 (codified at Tex. Elec. Code § 63.0101).

18. Voters who currently have none of the other forms of photo ID specified in SB 14 may apply for an EIC for use as identification at the polls. SB 14, § 20 (codified at Tex. Transp. Code § 521A.001).

19. SB 14 requires voters to travel to a DPS driver license office to obtain an EIC.

20. There is no driver license office in scores of Texas counties, and driver license offices in dozens of additional counties are open only one or two days a week.

21. SB 14 requires some voters to travel approximately 200 miles roundtrip in order to obtain an EIC.

22. Because Texas driver license offices do not conduct business during the weekend or after 6 p.m., some voters are required to take hours of time out of a workday to obtain an EIC.

23. Once at a Texas driver license office, a voter must present one or more of the following documents to obtain an EIC: (1) an expired Texas driver's license or personal ID card; (2) an original or certified copy of a birth certificate; (3) U.S. citizenship or naturalization papers; or (4) a court order indicating a change of name or gender. SB 14, § 20 (codified at Tex. Transp. Code § 521A.001); 37 Tex. Admin. Code § 15.182.

24. Each of the documents needed to procure an EIC costs money to obtain. A copy of a certified birth certificate from the Texas Bureau of Vital Statistics—the least expensive

option for those born in Texas—is $22.  It costs $345 to obtain a copy of U.S. citizenship or naturalization papers.

25.   A voter who does not present identification required by SB 14 at the polls may cast a provisional ballot.  SB 14, § 9 (codified at Tex. Elec. Code § 63.001).  However, that ballot will not be counted unless the voter presents the required ID within six days or executes an affidavit attesting that the voter either has a religious objection to being photographed or has lost his or her photo ID in a declared natural disaster that occurred within forty-five days of the election.  SB 14, §§ 17-18 (codified at Tex. Elec. Code §§ 65.054-.0541).

**Passage of SB 14 Was Motivated By Discriminatory Intent**

26.   Against a backdrop of dramatic growth in the State's Hispanic population, the Texas legislature advanced increasingly stringent and burdensome voter ID bills over several legislative sessions beginning in 2005.  This process culminated in the enactment of SB 14, a highly restrictive law that—when passed—exceeded the requirements imposed by any other state.

27.   Legislative debate and public statements concerning these voter ID bills contained anti-immigrant rhetoric.  In addition, while the public record contains statements suggesting that voter ID legislation was needed to prevent noncitizens from voting, noncitizens may lawfully possess several of the forms of identification required for in-person voting under SB 14.

28.   The State sought to minimize minority legislators' effective participation in the debate concerning SB 14.  The legislature and Governor implemented a series of unusual procedures including designating SB 14 as emergency legislation, which enabled the Senate to consider the bill on an expedited schedule; amending Senate rules to exempt voter identification legislation from the two-thirds majority tradition usually required for bill consideration; and

creating a select House committee, whose members were hand-picked by the Speaker, to consider only SB 14.

29. While the stated purpose of SB 14 was to ensure the integrity of elections, voter ID proponents cited virtually no evidence during or after enactment of SB 14 that in-person voter impersonation—the only form of election fraud addressed by the identification requirements of SB 14—was a serious problem or that the State's then-existing identification procedures had failed to prevent in-person voter impersonation.

30. The State knew or should have known that Hispanic and African-American Texans disproportionately lack the forms of photo ID required by SB 14, as compared to their Anglo counterparts.

31. Nevertheless, supporters of voter ID in the Texas legislature made little to no effort to analyze the potential effect of photo ID requirements on minority voters and rejected amendments requiring investigation of the effect of SB 14.

32. The State knew or should have known that the process of obtaining an EIC will impose a substantial burden on thousands of voters, especially Hispanic and African-American Texans who are disproportionately poor and disproportionately lack access to transportation.

33. Nevertheless, the Texas legislature consistently rejected amendments intended to mitigate this burden, including measures providing for expansion of the types of permissible voter IDs and measures to alleviate the costs of transportation and underlying documents for indigent voters.

34. The legislature that passed SB 14 was "impermissibly focused on race" in another matter that it undertook during the same session, namely decennial redistricting. Opinion at 6, *Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex. Mar. 19, 2012) (three-judge court) (ECF No. 690);

*see also Texas v. United States*, 887 F. Supp. 2d 133, 161 & n.32 (D.D.C. 2012) (three-judge court) ("The parties have provided more evidence of discriminatory intent than we have space, or need, to address here."), *vacated*, 133 S. Ct. 2885 (2013).

**Implementation and Enforcement of SB 14 Will Have a Discriminatory Result**

35. SB 14 will disproportionately impact Hispanic and African-American voters in the State of Texas, resulting in their being disenfranchised at a greater rate than Anglo voters.

36. A substantial portion of Texas voters, many of whom are African American or Hispanic, lack the forms of photo ID required by SB 14.

37. Upon information and belief, Hispanic and African-American voters in Texas, as compared to Anglo voters, disproportionately lack the forms of photo ID required by SB 14.

38. The process of obtaining an EIC will impose a substantial burden on thousands of voters. As a result, some individuals will not obtain an EIC and will thus be unable to vote. The burden and resulting disenfranchisement will disproportionately affect Hispanic and African-American Texans, who are disproportionately poor and disproportionately lack access to transportation.

39. Race and membership in a language minority group continue to be significant and oftentimes decisive factors in the State of Texas's electoral process in that:

    a. Texas elections at virtually every level are marked by a pattern of racially polarized voting;

    b. Many Hispanic and African-American citizens in Texas continue to suffer the effects of official discrimination, including a history of discrimination in voting-related activities;

  c. The effects of discrimination on Hispanic and African-American citizens in Texas, including their markedly lower socioeconomic conditions relative to Anglos, continue to hinder their ability to participate effectively in the political process in Texas;

  d. Racial appeals continue to characterize certain political campaigns in Texas; and

  e. The Texas legislature has been less responsive to the concerns of Hispanics and African-Americans than to the concerns of Anglos.

40. The policies proffered in support of the particular restrictions contained in SB 14 are tenuous and unsupported in the legislative record or by other evidence. To the extent the legislature provided any reasons for its rejection of numerous ameliorative amendments to SB 14, they are equally tenuous.

41. The political processes in the State of Texas—which are not equally open to participation by African-American and Hispanic voters—resulted in the enactment of SB 14.

42. SB 14 will result in Hispanic and African-American voters having still less opportunity than other members of the Texas electorate to participate in the political process and to elect representatives of their choice.

**Administrative and Judicial Review of SB 14 Under Section 5 of the Voting Rights Act**

43. SB 14 has not been in effect in any election in Texas. At the time that SB 14 was signed into law—on May 27, 2011—Texas could not implement any changes to its voting procedures without first obtaining preclearance from the U.S. Attorney General or from a three-judge court of the U.S. District Court for the District of Columbia, as a result of Texas's coverage under Section 5 of the Voting Rights Act (Section 5). 42 U.S.C. § 1973c(a); 28 C.F.R. pt. 51 app.

44. In order to obtain preclearance under Section 5, Texas was required to demonstrate that SB 14 "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race[,] color[, or membership in a language minority group]." 42 U.S.C. § 1973c(a); *see also id.* § 1973b(f)(2).

45. Texas submitted SB 14 to the Attorney General for Section 5 review on July 25, 2011.

46. During the administrative review under Section 5, Texas submitted two datasets regarding ID possession.

47. A dataset submitted by Texas, current as of September 16, 2011, purported to show that 4.7% of Texas's registered voters—603,892 persons—lacked a DPS-issued driver's license or personal ID. This figure was derived from a comparison of the State's voter registration and DPS databases. In the September 2011 dataset, 6.3% of Hispanic registered voters (as estimated by Spanish surname analysis) lacked a DPS-issued ID, as compared to only 4.3% of non-Hispanic registered voters. This non-Hispanic figure included both Anglos and African Americans.

48. In January 2012, Texas submitted a second dataset purporting to show that 6.2% of all Texas registered voters—795,955 persons—lacked a DPS-issued driver's license or personal ID. This figure was again based on a comparison of the State's voter registration and DPS databases. These data stated that 10.8% of Hispanic registered voters (as estimated by Spanish surname analysis) did not have a DPS-issued ID, as compared to only 4.9% of non-Hispanic voters. Here again, the non-Hispanic figure included both Anglos and African Americans.

49.     Texas provided no data specifically addressing ID possession by African-American voters.

50.     On March 12, 2012, the Attorney General interposed an objection under Section 5 to Texas's submission of SB 14 because Texas had failed to show that the law "will not have a retrogressive effect, or that any specific features of [SB 14] will prevent or mitigate that retrogression." Letter from Thomas E. Perez, Asst. Atty. Gen., to Keith Ingram, Tex. Dir. of Elections, at 5 (Mar. 12, 2012) (Ex. 1).

51.     The Attorney General explained that Texas's own data had shown that Hispanic voters were at least 46.5% more likely (according to the September 2011 data) and potentially up to 120.0% more likely (according to the January 2012 data) than non-Hispanic voters to lack a driver's license or personal ID card issued by the State. *See* Perez Let., *supra*, at 3.

52.     The Attorney General also concluded that Texas had failed to show that the availability of the EIC would mitigate the retrogressive effect of SB 14 on Hispanic registered voters, based on the lack of vehicle access for minority voters, the limited hours of operation of many DPS offices, and the lack of DPS offices in nearly one-third of Texas counties (many of which showed particularly stark disparities in ID possession rates between Hispanics and non-Hispanics). *See* Perez Let., *supra*, at 4.

53.     Because Texas failed to show that SB 14 would not have a discriminatory effect under Section 5, the Attorney General did not reach a determination as to discriminatory purpose. *See* Perez Let., *supra*, at 5.

54.     On January 24, 2012, Texas filed a declaratory judgment action seeking judicial preclearance under Section 5 of SB 14 from the U.S. District Court for the District of Columbia. *See Texas v. Holder*, No. 1:12-cv-128 (D.D.C. filed Jan. 24, 2012).

55. On August 30, 2012, following a weeklong bench trial, the three-judge court issued a unanimous decision denying preclearance under Section 5 to SB 14 and concluding that "record evidence suggests that SB 14, if implemented, would in fact have a retrogressive effect on Hispanic and African American voters." *Texas v. Holder*, 888 F. Supp. 2d 113, 138 (D.D.C. 2012). The three-judge district court concluded that "(1) a substantial subgroup of Texas voters, many of whom are African American or Hispanic, lack photo ID; (2) the burdens associated with obtaining ID will weigh most heavily on the poor; and (3) racial minorities in Texas are disproportionately likely to live in poverty." *Id.*

56. The three-judge court further held that the burdens imposed by SB 14 on voters without requisite ID violate Section 5 given the undisputed socioeconomic disparities that affect African-American and Hispanic Texans as compared to Anglos. *See Texas v. Holder*, 888 F. Supp. 2d at 140. The court stressed that poverty rates in Texas for Hispanics and African Americans (25.8% and 23.3%, respectively) greatly exceed the rate for Anglos (8.8%) and that the burden of traveling to a DPS office would fall especially heavily on "the predominantly minority population whose households lack access to any car at all," given that "13.1% of African Americans and 7.3% of Hispanics live in households without access to a motor vehicle, compared with only 3.8% of whites." *Id*.

57. Finally, the three-judge court found that the Texas legislature enacted "the most stringent [voter ID law] in the country" and "ignor[ed] warnings that SB 14, as written, would disenfranchise minorities and the poor" and rejected or tabled potentially ameliorative amendments that would have:

- waived all fees for indigent persons who needed the underlying documents to obtain an EIC,
- reimbursed impoverished Texans for EIC-related travel costs,

11

- expanded the range of identifications acceptable under SB 14 by allowing voters to present student or Medicare ID cards at the polls,
- required DPS offices to remain open in the evening and on weekends, and
- allowed indigent persons to cast provisional ballots without photo ID.

*Texas v. Holder*, 888 F. Supp. 2d at 144 (internal citations omitted).

58. On December 17, 2012, the three-judge court in *Texas v. Holder* entered a final judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, against Texas on its statutory preclearance claim under Section 5 of the Voting Rights Act.

59. Texas filed a direct appeal to the U.S. Supreme Court from the judgment entered by the three-judge court in *Texas v. Holder*.

60. On June 25, 2013, the Supreme Court decided *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). In *Shelby County*, the Supreme Court held that it is unconstitutional to use the coverage formula in Section 4(b) of the Act, as reauthorized by the Voting Rights Act Reauthorization and Amendments Act of 2006, "as a basis for subjecting jurisdictions to preclearance" under Section 5 of the Act. *Id*. at 2631.

61. Within hours after the *Shelby County* decision, the State of Texas announced its intention to begin enforcing the voter ID requirements of SB 14.

62. On June 27, 2013, in response to Texas's appeal, the Supreme Court summarily vacated the judgment in *Texas v. Holder* and remanded for further consideration in light of the decision in *Shelby County*. *See Texas v. Holder*, 133 S. Ct. 2886 (2013).

63. Since August 30, 2012—the date on which the three-judge court denied preclearance under Section 5 of SB 14 in *Texas v. Holder*—the Texas legislature has sat in one regular session and two special sessions. During those sessions, the Texas legislature has not

amended SB 14, held hearings concerning voter identification requirements, or convened a special committee to address voter ID.

### The Need for Section 3(c) Relief

64.     The State of Texas has employed a variety of devices to restrict minority voters' access to the franchise.

65.     In the absence of relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), there is a danger that Texas will continue to violate the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments in the future.

### CAUSE OF ACTION

66.     The United States re-alleges and incorporates by reference the allegations set forth above.

67.     Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

68.     SB 14 was adopted in 2011, and has been maintained since that time, for the purpose of denying Hispanics and African Americans equal access to the political process in violation of Section 2.

69.     Viewed in the totality of circumstances, Texas's implementation and enforcement of SB 14 will interact with social and historical conditions in Texas to deny equal opportunities for Hispanic and African-American voters to participate in the political process, resulting in a denial of the right to vote in violation of Section 2.

70. Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by implementing and enforcing SB 14.

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that this Court enter an order:

1) Declaring that Sections 1 through 15 and 17 through 22 of SB 14 were adopted and are being enforced with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution;

2) Declaring that Sections 1 through 15 and 17 through 22 of SB 14 would have the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973;

3) Enjoining the Defendants, their agents and successors in office, and all persons acting in concert with them, from enforcing the requirements of Sections 1 through 15 and 17 through 22 of SB 14;

4) Authorizing the appointment of Federal observers, pursuant to Section 3(a) of the Voting Rights Act, 42 U.S.C. § 1973a(a), to observe elections in Texas;

5) Retaining jurisdiction and subjecting Texas to a preclearance requirement pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c); and

6) Ordering such additional relief as the interests of justice may require, together with the costs and disbursements in maintaining this action.

Dated: August 22, 2013

| | |
|---|---|
| KENNETH MAGIDSON<br>United States Attorney<br>Southern District of Texas | JOCELYN SAMUELS<br>Acting Assistant Attorney General<br>Civil Rights Division |
| /s/ *Daniel D. Hu*<br>DANIEL DAVID HU<br>Assistant United States Attorney<br>Southern District of Texas<br>Texas Bar No.: 10131415<br>SDTX ID: 7959<br>1000 Louisiana, Suite 2300<br>Houston, TX 77002<br>(713) 567-9518<br>daniel.hu@usdoj.gov | T. CHRISTIAN HERREN, JR.<br>MEREDITH BELL-PLATTS<br>ELIZABETH S. WESTFALL<br>BRUCE I. GEAR<br>JENNIFER L. MARANZANO<br>ANNA M. BALDWIN<br>DANIEL J. FREEMAN<br>Attorneys, Voting Section<br>Civil Rights Division<br>U.S. Department of Justice<br>Room 7254 NWB<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530 |